Good morning, Your Honors. Senator Mel Bandian on behalf of Petitioners. You only used up nine minutes just getting up there. Madam Clerk, I would like to reserve three minutes for rebuttal, please. Your Honors, in this case, the issue here is the lead petitioner, Karine's credibility, and this is a pre-real ID case, of course. With regard to the sole issue in this case, the sole inconsistency that the judge found is with regard to the how they entered, where they entered from during prior trips. I think the problem was that there were records of prior entries and then presumably prior returns in between these incidences of alleged persecution, which caused the I.J. to think maybe those incidences didn't cause them to have the fear that they claim in this proceeding. That's correct, Your Honor. Your Honor, the I.J., just like you said, they may, he suspected that they may not have occurred and he was equivocal about it. He should have confronted the — Didn't he? I thought he confronted her and she denied that she had entered the country before. That's correct. And under Soto Alarte, the judge had to explain — well, first of all, nobody asked her, if you're denying, how do you reconcile that the record is — the record says that there's someone with a similar name who entered from, let's say, Lebanon. Yeah, but she knew — I mean, she knew that that's why the asylum officer had denied the claim to begin with. It was no secret that this was the main concern. That's correct. And she kept denying that. Why would she deny it? What would be the reason for denying it? If there's a clear government record, what would be the reason for denying it? I think, as Petitioner's counsel stated in the brief, that's not clear. Nobody asked her about why — I mean, basically, it could be that she was afraid, so afraid of the persecution that she suffered in Armenia on account of religion that she didn't want to bring up any of this. Well, that's not the concern. Why go back? What's that? She came over here three times before, and she went back three times before. Why go back? Well, Your Honor, sometimes — I understand what the Court is saying, but sometimes the individuals think that the country conditions may improve or that things may be better in the home country, but — I have a different question, which doesn't seem to be what the IJ and BIA were stressing exactly, and I'm not sure why. But the — my understanding is that the visas, the three visas for three different visits, were issued in Lebanon and said that she was either a resident or a citizen of Lebanon. So is what's really — this isn't what they're saying, but is the real problem here whether — that these strongly implicate whether she was really in Armenia at all? Your Honor, I do understand that the record raises that concern, but that's another thing that should have been asked to clarify. Did you live in Lebanon for a certain time? I was surprised that it wasn't asked as well. And so maybe because it wasn't asked, it's not what the BIA and the IJ said — I mean, they were a little unclear about why they thought this was all that important. It seems like really it was very important because it seems to suggest that she — I mean, it would seem very odd that if you're living in Armenia that you go to Lebanon to get a visa three times. But that isn't what their conclusion was. There's kind of a real mystery here, too. Where did she get the Pentecostal faith? This case is very perplexing. As I understand it, in Lebanon there's Muslims and there's Catholics. I guess there's some Christians. That's correct. There is some — well, there's Hezbollah, of course, who controls most of the country. It's actually what I was wondering if what the BIA might have been thinking in not saying, too. Yeah, and that was not addressed either in terms of possible persecution in Lebanon. It is very convoluted and complex, I agree. And, of course, it was hard to parse through the record and try to figure out why some questions were not asked. If I was off-course counsel at the time, I may have asked those questions. But basically, in this case — Well, this is the pre-IDEA Act. So we're free to consider whether these inconsistencies go to the heart of her claim. That's correct. And the IJ himself admitted throughout his decision and throughout the testimony that the testimony otherwise is entirely consistent, the heart of the claim. And extremely detailed. Extremely detailed and well-documented. And incredibly well-documented compared to other cases. That's correct. Because you have not only two testifying witnesses, but several people who brought — That's correct. And they did take the risk of bringing the witnesses to court. Wait a minute. She's a Molaghan? I'm sorry, Your Honor? A Molaghan? A Molaghan? Yeah. Oh. You know what a Molaghan is? Yeah, to send it back and give her another chance. Oh, goodness. I do. What is a Molaghan? A Molaghan, the golf term. Correct? What? You mean the golf terminology? Molaghan? Is that what you — A Molaghan. No, I do not, Your Honor. I apologize. No, I — That's what she says, isn't it? She's a Molaghan, you know. Yeah. And the Molaghans — And, Your Honor, also — There are lots of Molaghans in L.A., you know. They lived in my old neighborhood. It says Russian Molaghan Pentecostal in her declaration. You don't know what that is? It says, I was raised in a Pentecostal family. My parents were followers of the Russian Molaghan Pentecostal religion. There are four children in my parents' family. All of us were raised to follow the Pentecostal religion, even though religion was forbidden during the period of Soviet rule of Armenia. That's correct, Your Honor. The Molaghans are — they're a lot like Seventh-day Adventists. They don't — they're pacifists. They don't go in the military. You don't know that? I apologize, Your Honor. I'm being candid with the Court. That is something that I overlooked. They don't go in the military. Now, they do other things worth of national importance. But we had a lot of people that were Molaghans where I grew up. You know, big, strong guys, beautiful girls, you know. That's one I remember. And great football players. But that was their religion. They adhered to it. So — and they were terribly persecuted in Russia when the trouble started with the revolution. As many of them as could flee, fled. They came here to L.A. That's correct. They're still here. Yeah. Thank you, Your Honor. What is the — the I.J. had some of these documents looked at for authenticity. I decided that some of them were not — were, well, frauds, actually. And — but the BIA did not rely on any of that. Is that right? That's correct, Your Honor. That's kind of out of the case for now? That's correct. I mean, that's a very strange business, too, because you have some documents that are said to be fraudulent and others that are not. Well, yes, that's correct. But the — Karine Stepanian's birth certificate was found — actually sent to forensics and found to be genuine, which is the lead petitioner. Where she was born and so forth is important. The other documents, that's correct, that the forensics — Her marriage certificate and the birth certificate of her husband were both found to be altered. And no one rebutted that. Well, I guess through testimony, since they are otherwise consistent in their testimony, they were asked where were you born and — Right, but what do we make of the forensic expert saying that the documents related to her spouse, both related to her spouse, were altered? I believe, Your Honor, and I'll go back and check, that they indicated that — it's a Yehman Berhe-type situation where they indicated that — I'm sorry, what? Yehman Berhe-type situation where they indicated that the documents were received by them. They didn't personally pick it up from the clerk's office. So — and I'll go back and check the transcript on that. But in terms of why those documents being fraudulent was important and went to the heart of the claim, the persecution claim was also not addressed by the IJ and the BIA. And, Your Honor — The country report that was assessed either was considered, was it? The country report? For Armenia. It said that Pentecostals are being discriminated and persecuted. The BIA didn't examine the country report. That's correct. And the IJ. And also it's interesting that they just denied Katz without independent analysis of — That's what I'm talking about. Yeah, that's correct. But do we get there if we — oh, maybe we do, independently. If we decide that the adverse credibility determination was not supported by substantial evidence, we don't get to some of your other arguments, but we still have to look at the Katz claim, right? If you decide that the adverse credibility — you do, Your Honor. I believe the Court should look at that independently as well. What if we decided — I mean, as I — I mean, I think I've said what's bothering about this case. If we were — I mean, it does appear that they didn't really ask her about these discrepancies and why it said that she — her visa application said that she was a citizen of Lebanon and so on. I mean, if we were to say that the reasons that were given were not adequate, could they go back and now relitigate the question of whether she was really from Armenia at all? That would only be if the government sends it back on an open — I mean, if the Court sends it back on an open record pursuant to soto alerte. But if you find that the adverse credibility was not supported and then we move on to the eligibility phase, I think the only time the government would be able to reopen the issue is if they conduct an independent investigation again and find additional information, because they've had that opportunity to bring up all the evidence already up to this point. Yeah. Once you have a seat, we'll hear from you.  Thank you, Your Honors. Thank you. Morning. May it please the Court. Good morning. My name is Tracy Jones, and I'm appearing on behalf of the Respondent, Eric H. Holder. The Court should deny the position for review in this case because substantial evidence supports the adverse credibility finding, and the record evidence does not compel a contrary conclusion. In this case, the immigration judge relied on numerous inconsistencies that went to the heart of the claim. Well, they were not numerous. They were basically, you know, one category. Yes. And the question — it didn't go to the heart of the claim in any traditional sense. It had — I mean, it had to do with how she got here and why, and not with what happened to her in Armenia, if she was really in Armenia, as to which nobody — I mean, nobody took any — said anything adverse about her story, which was, as I said, incredibly detailed and unusually corroborated. And yet there is this very disturbed — so what is your understanding of what the IJ, or more importantly, the BIA, said was relevant to the heart of her claim about the way she got here? Well, Your Honor, I believe it was brought up with the petitioner. She entered into the United States two prior times before her last entry in August. But that's not particularly unusual. People come — I mean, giving up your entire life is a big deal, and she also had a daughter here. So the fact that she came and went back, and then finally, according to her story, you know, worse — more things happened that were terrible, and then she just finally gave it up and said, I've got to get out of here. That's not — that doesn't seem sufficient by itself. The fact that she went — that if it did, you would — there would be huge numbers of people who would lose on the ground that they weren't really afraid. I mean, that doesn't prove — doesn't seem to go to whether she was really afraid particularly. Well, it definitely undermines her claim, Your Honor. The most significant attack that she testified to occurred in May of 1995. Well, she also — but she did testify to significant physical attacks after 1998, right? Yes. Majority of attacks that she testified to occurring after 1995 was against her husband. But the most severe attack that actually occurred to the lead petitioner in this case occurred in 1995. She went back to — she traveled to the United States in 1996, and then also in 1998, returning to Armenia. My only answer is, if she had said this, that she'd done this, and then they had relied on that as a reason for saying that nothing she said was wrong, otherwise said was true because she'd gone back and forth two times, that would never fly. What's disturbing here is that she lied about it. Yes, that's true. But that means that — and you want to know why, and you want to — it's just sort of a big mystery. But if she had just gotten up and said — if her whole story originally had been, you know, I came here twice, and then I came again on a visitor visa, but I want asylum because this is what happened to me, I don't think anybody would say boo about that in terms of the fact that she'd been here twice before and gone back. But the other thing that's sort of interesting about her history of persecution is that the persecutors kept changing over time. In the beginning, it was the KGB. When Armenia was — according to her story, if you believe it, when Armenia was controlled by the Soviet Union, they were persecuted by the KGB. And I think the most recent, there was a new transition to a new government in Armenia, and then the police started persecuting to the point where they're evangelicals, and so they couldn't perform their evangelical work. So she — I mean, it's conceivable, it's possible that under some of the regimes, she felt she could go back and still perform the tenets of her religion, but in this last regime, she gave it up. She wasn't going to be able to do that. Yes, and that's possible, Your Honor, but — Well, it's hard for people to leave where they were born, where they grew up, you know. They get kicked around and leave. They want to go back. That's where, you know, the family lives. That's what they know. You know, the Armenians have lived through lots of adversities throughout the centuries, so, you know, and they're still there. You'd think all of them would have gotten out when they had a chance, but a lot of them stayed. Well, we've got to consider that, too. We've got to consider the fear that they live under, but still that pull to go back, you know, it's their country, too. And that's true, Your Honor, but in this case, the petitioner did not present credible evidence, which is her burden of proof. The IJ didn't know what to believe. Well, he didn't try very hard. I mean, she put out this statement. I read it. It's one of the most complete statements that I've read on the Declaration of Katrine Defanian. She goes through this, and, you know, it just goes on page after page. It's a translation, but it's written. It's detailed. It explains her life, and, you know. And then he doesn't even look at the country report when it comes to this torture claim. I mean, there wasn't ultimately any finding or suggestion that she wasn't actually a resident of Armenia. In other words, this is what confuses me. Did they ever ask her directly? I understand that the lawyer got up and said they're denying that they really came in early. Did they ever ask her directly whether she, you know, why there was this discrepancy? In regards to the number of entries? Yes, they did, Your Honor. She just denied it. They asked her why this says that you're a citizen of Lebanon or any of that? Well, Your Honor, when it comes to the lead petitioner, her citizenship was really not in question because the birth certificate that she submitted from the government of Armenia was actually deemed authentic. Except that the visa application said she was a citizen of Lebanon. Yes, that's correct, Your Honor. And another one said she was a resident of Lebanon. And that seems to me to be the all-important thing because it suggests that, you know, if she was not in Armenia, then all these things couldn't have happened to her in Armenia. And that's correct, Your Honor. But nobody says that, that it's not the finding. And that's correct, Your Honor. The finding is that the number of entries into the United States undermines her claim for asylum because if she was actually fleeing Armenia, then she would not have returned two to three times after. But is it not true, would you not agree with me that I could find 200 cases in which that happened, people go and come for exactly the reason Judge Pragerson says. I mean, they're trying to see whether they can make it or live somewhere else, but they've lived this place their whole life. And she had a daughter here. So if it all had been above board, it couldn't possibly have had any significance. That's correct, Your Honor. But in this case, it does have a weighing because there's a pattern of dishonesty here in this case. But see, then you're saying something different. Then you're saying they were entitled to disbelieve everything she said because she lied about this. And that seems inconsistent with the case law, the heart of the claim case law. So in other words, either you're saying, well, she's proven to be a liar, so we can disbelieve all these other things she said, even though this doesn't go to the heart of the claim. And that we can't do under the case law for the pre-ID Act, right? So that presumably is why they came up with this other thing. But the other thing, you know, standing by itself can't possibly be sufficient because, you know, it happens all the time. And we all have this instinct that if she hadn't lied about it, nobody would have seized on it at all. Yes, that's correct, Your Honor. But it's correct. Then you have to lose, even though there's something very disquieting about this case. Well, Your Honor, again, the immigration judge in this case didn't know what to believe because the Petitioner spelled to meet their burden of proof of the date of entry. But that's a different issue. I mean, you're just reciting something, right? I mean, that's saying because she lied about this, he could disbelieve everything she said. Right? Isn't that what you're saying when you're saying he didn't know what to believe? Well, Your Honor, what I'm saying is that her whole basis of her claim was on persecution from that she experienced in Armenia. Here, the I.J. doesn't know whether she's --. But that's exactly what he didn't say. I mean, that's exactly what you're not saying. Because for some reason they were never willing to bite the bullet and say, well, you know, we doubt that she was ever in Armenia. They didn't say that. That's correct. They didn't. So, you know, what happens if we send it back? What happens if we say this isn't sufficient to support the adverse credibility determination that was made on the purported grounds on which it was made? What happens if we send it back? Then would they really look into the claim and see if all this stuff happened? Yes, Your Honor. The immigration judge in this case found the Petitioner's incredible. So that was dispositive of their claim, not reaching the merits of it. So under I.N.S. Ventura and Gonzalez v. Thomas, this court would have to reband it back to the agency to consider the claims for asylum. To me, this is like a do-over. Do it right. I mean, this is an older case. I don't know why we're hearing it now. I know it's been languishing around. It's an older case. And I know for a fact that the immigration judges have gotten a lot better. And we probably wouldn't have this case in the past year if we had some of our current immigration judges looking at this. Well, Your Honor, the immigration – But if we determine that these inconsistencies don't go to the heart of her claim, then as the law existed at that time, they're really – they're really not a factor. Then you – they're not – they don't go to the heart of the claim. So then that ends it there. That's not – doesn't stop them, close the door on them. Then we go on to the merits. Well, the agency would have to rule on the merits first, Your Honor, since they did not in this case. So if you find that substantial evidence does not support the adverse credibility finding, it must be remanded to the agency to consider the merits. The agency has the discretion to grant asylum relief and also withholding of removal, which they did not get to the merits in this case because the adverse credibility finding was dispositive of the claim. So therefore, the agency should have to consider this in the first instance, not this Court. You know, another thing that's going on in the world during that time, and, well, it's going on today too, but many, many people that lived in the Russian Armenia, they also moved to Beirut, and they moved back and forth. And then they get caught in that circle of war, and some of them are in Fresno right now. I know that because I had a lot of these cases when I was a district judge. So, you know, it's – and a lot of them are survivors of what the – what has been called the Armenian massacre of a million people. And I know one of them was on the California Supreme Court. He tells us that story. So you have to think about all those things when you arrive at a – when the government arrives at a compassionate decision. Yes, Your Honor. Okay. Just one last question. Yes. This may be a stupid question, but what's an apostille? What are these things? I believe, Your Honor, and I'm not quite sure, so please don't hold me to this, but I believe, from my understanding, it's just almost similar to, I don't want to say a birth certificate, but it's issued by the government. And I believe it's to help with identity issues. They said that those were authentic. Yes. That's a mystery, too, another mystery. Exactly, but the birth certificate that was allegedly submitted from the Armenian government was found in the male petitioner's case to be fraudulent and altered. This has been a pleasure having you here. Thank you. So did you come out from Washington to this terrible weather? I was hoping for better weather, but at least it's not 40 degrees. And you have a very nice, clear voice. Thank you. You're not from Tennessee, are you? No, I'm not. Where are you from? People say I'm from, I have a southern accent, but I'm actually from Maryland. Well, that's pretty close. Yes. Yeah, yeah, yeah. I know my daughter was, went to medical school, and she went to the University of Virginia. Okay. But when she came back, she was a typical, had a typical southern accent for a long time. Yeah, we have a tendency to rub off on people. Yeah. Well, thank you, Your Honors. Thank you. Well, we'll have good weather in about four hours. So ordered. Your Honors, so, yeah, since, I think since I went over my time, unless the Court has something to address, I think Your Honors have covered. I think you have nothing else to say. You can see the way the. . . That's correct. So that's why, unless you want me to address anything. I have one other question. It appears that one of them, I guess the husband actually has a United Citizens mother who could apply for a visa for her, but hasn't. Is that right? There is no pending visa. I believe that's true, because even if it became current, the priority date, they would not be eligible under Section 245i, because it would be filed after April 30, 2001. So they would have to return to their home country, which they don't want to do. Okay. Thank you, Your Honors. Thank you.
judges: Pregerson, Wardlaw, Berzon